UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:23-CR-036(3) |
| | : | |
| Plaintiff, | : | JUDGE BARRETT |
| v. | : | |
| | : | **UNITED STATES' SENTENCING** |
| JERIN JOHNSON SR., | : | **MEMORANDUM** |
| | : | |
| Defendant. | : | |
| | : | |

## INTRODUCTION

Jerin Johnson picked up ten firearms in illegal straw purchases and tried to pick up two more. Worse, he knew or should have known the firearms had been bought with stolen credit card information, and he recruited two other people—including codefendant Cedric Conyers—to join the conspiracy, too.

In addition to these firearms crimes, Johnson, during the COVID-19 pandemic, also fraudulently obtained more than $20,000 in benefits under the Paycheck Protection Program by falsely claiming he needed the money for a handyman business that, in reality, did not exist.

For the reasons given below, the government respectfully requests that the Court impose a term of imprisonment of 37 months, followed by three years of supervised release. The government also requests that Johnson be ordered to pay full restitution to the SBA and, separately, to the gun stores (jointly and severally with codefendant Zephaniah Jones), as well as a $200 special assessment.

## **BACKGROUND**

**A. Johnson picked up ten firearms in straw purchases, tried to pick up two more, and recruited another defendant, who tried to pick up three others.**

In or about June 2022, Jerin Johnson agreed with Zephaniah Jones, the leader of a large straw-purchasing conspiracy, that Johnson would pick up firearms that Jones had ordered for delivery to Cincinnati-area federal firearms licensees (FFLs). Jones ordered the firearms in Johnson's name to cover up the fact that so many firearms—in the end, more than 40, ordered in the names of several coconspirators—were going to Jones. This practice of buying firearms in someone else's name is called "straw purchasing."

On June 24, 2022, Johnson, in furtherance of the agreement, went to Right 2 Arm Firearms, a Cincinnati-area FFL, and completed a transfer of two Glock 19x 9mm pistols. On an ATF Form 4473 - Firearms Transaction Record, a form required to be submitted when purchasing a firearm from an FFL, Johnson lied and indicated that he was the true purchaser of the firearms, when in fact he was picking them up for Jones.

The next day, Johnson texted Jones to let him know he could pick up more firearms: "going outta town Thursday bra so I tryin get few more drops before den if u can make it happen."

Shortly thereafter, Johnson completed three more straw purchases, specifically:

- On June 28, 2022, Johnson completed the transfer of two ATAC Defense ADEP pistols at North College Hill Gun Store;

- On July 6, 2022, Johnson completed the transfer of a Glock 19x pistol and an F.M. Products FMP9 pistol at Target World; and

- On July 8, 2022, Johnson completed the transfer of three ATAC Defense ADEP pistols and one ATAC Defense ADBP pistol at North College Hill Gun Store.

On the same day as the July 6 straw purchase described above, Johnson sent Jones a text, asking, "Bra u hipped to briansclub??" This was an apparent reference to BriansClub, a black-market website known for trafficking in stolen credit card information. Jones responded that he "use[d] to be on there last year" but that "that shit don't work." Johnson assured Jones that the site was "back hittin," explaining that "[his] folks" had "hit [him] last night bout it…."

The day after the July 8 straw purchase, Johnson texted Jones to ask if he needed more people to help pick up more guns, writing "do u need another body so u can get more dropping?" When Jones responded affirmatively, Johnson wrote: "How many u tryin get i got trust worthy mfs on same ShIt as me i just ain't kno if u a fuck around or not that's y i asked." Jones responded, "Call me." Later the same day, Johnson texted Jones the names and contact information of two people, including codefendant Cedric Conyers, and told Jones that "they both said yea . . . ."

A few days later, on July 13, 2022, Jones placed online orders in Conyers's name for several firearms to be delivered to Target World.

Two days later, on July 15, 2022, Johnson texted Conyers, asking, "U got goin on fool u talk to bra today or going to get them joints?" Johnson's texts show that he commonly referred to Jones as "Bra," and, based on context, "joints" seems to have been a reference to the firearms. Conyers did not respond; however, he placed an unanswered call to Johnson two hours later, and the next day they spoke by phone twice.

On July 18, 2022, an ATF Special Agent responded to Target World after receiving information from the store manager that, based on phone calls he/she had just received from Conyer and Johnson, she knew that both men were on their way to the store to pick up firearms ordered in their names.

3

Later that day, Johnson arrived at Target World and attempted to complete the transfer of two pistols Jones had ordered. Conyers also tried to pick up the three pistols ordered in his name. Both transfers were denied.

**B. In addition to the firearms crimes, Johnson committed fraud in connection with COVID-19 disaster benefits.**

Separate from the straw-purchasing crimes described above, Johnson also committed fraud in connection with COVID-19 benefits. In an application submitted in April 2021 to the Small Business Administration (SBA), Johnson falsely claimed that he was the sole proprietor of a handyman and contracting business that was in operation on February 15, 2020, and that had $97,857 in gross income in 2020. Johnson knew these statements were false, because he had no such business. These false statements were also material to the SBA, which relied upon them in awarding JOHNSON a Paycheck Protection Program (PPP) loan for $20,385. This loan was later forgiven.

### APPLICABLE LAW

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Then, "the district court must weigh and apply the range of factors outlined in 18 U.S.C. § 3553(a)." *Id.* at 49-50. These include (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). The Court should impose a sentence sufficient but not greater than necessary to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

## ARGUMENT

**A. The government agrees with the Guidelines calculation and statutory requirements set out in the Presentence Report.**

The government agrees with the Guidelines calculations in the Final Presentence Report, which result in a Guidelines range of 37-46 months.

The statutory maximum term of imprisonment on Count 10 is ten years; on Count 23, it is five years. The maximum term of supervised release is three years on each count, with multiple terms of supervised release to run concurrently. Restitution is mandatory, as is a special assessment of $200.

**B. The government respectfully submits that a consideration of the § 3553(a) factors shows that a sentence 37 months' imprisonment, followed by three years of supervised release, is appropriate here.**

The nature and circumstances of this offense are serious: By bypassing the federal law requiring firearms purchasers to provide truthful information on ATF Form 4473, Johnson helped ten firearms get into the hands of people who should not have had them. And out of all the straw purchasers in this case, Johnson is responsible for the largest number of firearms: twelve that he himself picked up or tried to pick up, plus another three that he recruited Conyers to help with. The sheer number of firearms Johnson picked up for Jones should have been an indication that he was not keeping them for his personal use, but was instead planning to resell them on the black market.

Even worse, Johnson, unlike many of the other straw purchasers, knew or should have

known that Zephaniah was buying the firearms with stolen credit cards. As described above, the two discussed BriansClub, making clear that both were experienced with using stolen credit card information. The firearms Johnson helped pick up were valued at more than $12,000—so he had every reason to believe that Jones was buying them with someone else's money.

Another aggravating circumstance is that Johnson—again, unlike any of the other straw purchasers—recruited another defendant to join the conspiracy. And he did so without being prompted by Jones; he proactively reached out and asked Jones if he needed help finding more conspirators. All of these facts and circumstances of the charged offense weigh in favor of a substantial custodial sentence.

Deterrence is also an important consideration in this case for several reasons. First, straw purchasing is a serious problem in Cincinnati. In this case alone, Jones was able to obtain more than 40 firearms via straw purchases—approximately a fourth of which came from Johnson. And this is just one of many such cases investigated by ATF in recent years. Firearms bought in straw purchases are often used in crimes within days or weeks of being bought—and that was the case here, where at least four of the firearms involved in the conspiracy were recovered in connection with other crimes, all less than a year later. When firearms are bought under someone else's name, it is more difficult for law enforcement to solve the crimes in which those firearms are used. It is therefore important for the sentence in this case to send a message of general deterrence to the public, making clear that straw purchasing is a felony, and a serious one.

General deterrence is also important as to the PPP fraud. PPP benefits were meant to support American businesses during an unprecedented health crisis. Especially given how important it was to issue those benefits quickly, the government did not have the resources to do a deep dive on every PPP application to come through the door and was required, to some extent,

to rely on the good faith of those applying. But people like Johnson took advantage of that crisis to enrich themselves. Sending a message of general deterrence is important to help prevent others from doing the same in the future.

Turning next to the defendant's history and characteristics, the government notes that Johnson described a happy childhood during which he was "spoiled." His parents were married and employed, and his family was financially stable. He apparently attended college for several years in California but dropped out. Since then, he has not been consistently employed. The PSR noted that, in October 2024, while this case was pending, Johnson was fired from his job for "performance-related issues." Nevertheless, the government acknowledges that Johnson has a very limited criminal history, with just a single misdemeanor conviction for possessing marijuana, for which he served no time. Therefore, a term of imprisonment may have a significant deterrent effect on him.

In the plea agreement, the government agreed to recommend a sentence of not more than 43 months. However, upon further consideration of the facts of the case, the defendant's limited criminal history and the lack of other substantial aggravating circumstances in his background, the sentences other defendants in this case have received, and Johnson's relative culpability, the government is recommending a low-end sentence of 37 months. The government believes such a sentence would be sufficient but not greater than necessary to meet the goals of sentencing here, because, in the government's view, it reflects a six-month downward variance on the straw purchasing case (31 months), plus an additional six months for the PPP fraud, which the Guidelines suggest should weigh in favor of a sentence at the higher end of the range, given that, under the Grouping rules, it does not affect the offense level. *See* PSR ¶¶ 82-84; U.S.S.G. § 3D1.4 (noting that, where a "Group" under the Guidelines does not increase the applicable

7

offense level under the grouping rules, this "may provide a reason for sentencing at the higher end of the sentencing range"). Because Johnson has not served time in prison before, the government believes a 37-month sentence is likely to have a substantial deterrent effect on him. A term of imprisonment of more than three years also reflects the seriousness of Johnson's offenses and sends a message of general deterrence, while the downward variance from the Guidelines range reflects the mitigating circumstances present and the need to avoid unwarranted sentencing disparities. The government further requests that the Court impose a three-year term of supervised release to assist Johnson in finding and maintaining employment upon his release from prison.

## **CONCLUSION**

For the reasons given above, the government respectfully requests that the Court sentence Johnson to 37 months' imprisonment, three years of supervised release, full restitution to the SBA and to the FFLs listed in the PSR, and a $200 special assessment.

Respectfully submitted,

DOMINICK S. GERACE II
UNITED STATES ATTORNEY

*/s/Julie D. Garcia*
JULIE D. GARCIA (CA 288624)
Assistant United States Attorneys
United States Attorney's Office
221 E. Fourth St. Suite 400
Cincinnati, OH 45202
513-684-3711
Julie.Garcia@usdoj.gov

8