**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:23-CR-00036 |
| | : | |
| Plaintiff, | : | JUDGE MICHAEL R. BARRETT |
| | : | |
| vs. | : | **DEFENDANT JERIN JOHNSON,** |
| | : | **SR.'S MEMORANDUM IN SUPPORT** |
| JERIN JOHNSON, SR., | : | **OF HIS SENTENCING POSITION** |
| | : | |
| Defendant. | : | |

Pursuant to Fed. R. Crim. P. 32, Defendant Jerin Johnson, Sr. respectfully submits his

Memorandum in Support of His Sentencing Position.

Dated: December 10, 2025

Respectfully submitted,

*/s/ William R. Gallagher*
William R. Gallagher
ARENSTEIN & GALLAGHER
114 East Eighth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-5666
Facsimile: (513) 651-5688
Bill@ArensteinGallagher.com

Benjamin G. Sandlin
THOMPSON HINE LLP
312 Walnut Street, Suite 2000
Cincinnati, OH 45202
Telephone: (513) 352-6700
Facsimile: (513) 352-4771
Ben.Sandlin@ThompsonHine.com

*Counsel for Defendant Jerin Johnson, Sr.*

1

## I.      INTRODUCTION

Jerin Johnson, Sr. is prepared to accept the consequences of his actions, atone for his misconduct, and resume his station as a responsible, present father for his two sons, 13 and 14 years old, and his partner's eight-year-old son which Johnson treats as his own. The circumstances which precipitated the instant charges were a lapse in judgment resulting in being involved with the wrong individuals during the COVID-19 pandemic which caused financial instability in hundreds of thousands of American households. Johnson's minimal, non-violent, single-misdemeanor criminal history indicates that Johnson is far from the type of offender that this Court often encounters. Accordingly, Johnson respectfully requests that the Court:

1.      Deviates downwards from the maximum 43-month sentence pursuant to the Plea Agreement and sentences Johnson to 24 months of incarceration;

2.      Waives fines;

3.      Orders a $200 special assessment; and

4.      Orders restitution in the amount of:

    a.   $20,385.00 to the Small Business Administration ("SBA"); and

    b.   $12,786.08 jointly and severally with Zephaniah Jones.

## II.     APPLICABLE LAW

The bedrock principle that "the punishment should fit the offender and not merely the crime" reflects the undeniable truth that no two people are alike. *Pepper v. United States*, 562 U.S. 476, 487-88 (2011); *see United States v. Ferguson*, 518 Fed. Appx. 458, 466-467 (6th Cir. 2013) ("A foundational principle of sentencing procedure established in 18 U.S.C. § 3553 is that the sentence is to be individualized."). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every

2

case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996), *superseded by* 18 U.S.C. 3742(e) *on other grounds* (appellate standard of review of sentencing) *as stated in U.S. v. Thurston*, 358 F.3d 51, 70 (1st Cir. 2004); *see United States v. Herrera-Zuniga,* 571 F.3d 568, 585 (6th Cir. 2009) ("the sentencing court must make an individualized assessment of the appropriate sentence based on the facts presented" and "the unique circumstances of the defendant's case").

The "focal point" of sentencing is 18 U.S.C. § 3553(a). *U.S. v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006). Under this statute, the Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a) (emphasis added). The Court must determine the appropriate sentence considering several factors: the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; and the need for the sentence imposed. *Id.*

III.     **ARGUMENT**

A.     **The Nature and Circumstances of the Offense Warrant a Downward Departure.**

The Plea Agreement catalogues many of the offense's circumstances. In the Summer of 2022, Johnson represented on several ATF Form 4473's that he was picking up a firearm intended for his own use when he intended to provide those firearms to another. These representations were false. Separately, in April 2021, during the COVID-19 pandemic, Johnson submitted an application to SBA for a Paycheck Protection Program ("PPP") loan. Johnson requested a loan in the amount of $20,385.00. Johnson misrepresented the fact that the business existed. Johnson acquired a PPP loan for $20,385.00, which was later forgiven, based on his representations.

3

Johnson has admitted to these actions in his Plea Agreement. Indeed, "he has affirmatively accepted responsibility for the offense." (Investigation Report, Doc. # 145 ("PSIR"), ¶ 56).

Critically, each of these offenses were designed for Johnson to acquire sustaining income during the COVID-19 pandemic and shortly after its fallout. Suffice to say the COVID-19 pandemic had profound effects on the country and the world. Importantly to this case, the COVID-19 pandemic impacted and disrupted income for many Americans and caused significant increases in production and sale of numerous goods – like food – which Americans needed to survive. The amounts at issue also demonstrate that Johnson did not engage in these acts to acquire substantial wealth, purchase expensive cars, or live a lavish lifestyle. Instead, Johnson's personal history indicates that Johnson only ever attempted to care for his family.

> **B.** **Johnson's Personal History and Characteristics Warrant a Downward Departure.**

Johnson is a family man who has a nearly nonexistent state-court criminal history and for whom this is his first federal offense. Johnson was born on November 27, 1987. He had two parents, three siblings, and another sister who passed away in 2008.

Johnson's siblings are much older than him, and his siblings' children, Johnson's cousins, are very close with him. Several of his cousins drafted letters in support of this memorandum.[1] Johnson's cousins describe him as "a big advocate for entrepreneurship," active in his community and church, their "best friend," and a "go-to person for advice and encouragement," among other accolades. (Ex. A).

From an early age, family has been most important to him. His parents spoiled him, and he has tried to give his children a better life than he had. Johnson went to college in California, but,

---

[1] A fair and accurate copy of letters from Keiarra Jones, Steve Martin, and Desire Morris drafted in support of Johnson's Sentencing Memorandum are attached as a composite Exhibit A.

when he learned that his then-partner was pregnant, he left college and moved back home. In the mid-2000s, Johnson's then-partner gave birth to J'Adore. Johnson raised J'Adore for five years but eventually learned that he was not her biological father. For a family man like Johnson, the realization distressed him.

Then, more than a decade ago, Johnson met Cierra Parker. Johnson and Parker have two sons together. Johnson and Parker broke up after years together, but they maintain a fantastic co-parenting relationship. Johnson is actively involved in all aspects of his sons' lives. They are smart and well-behaved. Johnson loves his sons. Parker agrees. Parker told the Probation Officer that Johnson is a "responsible and hard-working person." (PSIR, ¶ 107). She stated that he is a "dedicated father, and his sons love spending time with him." (*Id.*).

Johnson's current partner, Angelique Stovall, and Johnson have been dating since 2020. While Stovall and Johnson do not have children, Stovall has an eight-year-old son from a prior relationship. Johnson treats Stovall's child as his own and cares for her son as if he was his own. Stovall suffered from abuse in a prior relationship. Despite struggling at times with that reality, Johnson is actively attempting to mend Stovall's and her son's lasting wounds from abuse in their relationship.

Stovall supports Johnson. (*See* Ex. B).[2] She affirmed that Johnson "has taken [her] son in as his own and treats him like a son." (*Id.*). Importantly, "[w]ithout Jerin being in [her] son's life, [she] know[s] it would have a big impact on him in many ways." (*Id.*). Stovall credits Johnson for "cho[osing] to be a consistent father figure in his life since he was 4 and he is now 7, [and his father] passed away when he was 5." (*Id.*). Stovall affirmed that Johnson is a family man, and that his family needs him just as much as he needs his family. (*Id.*).

---

[2] A fair and accurate copy of a letter drafted by Angelique Stovall is attached a Exhibit B.

Johnson's focus on family and children impacted his career before the instant charges surfaced. Prior to the indictment, Johnson worked at A New Path, a facility caring for at-risk and troubled youth. Johnson cared for the children, played with them, and took them on field trips. Johnson loved his job despite making less than he has made recently working as a Coca-Cola and Pepsi delivery driver. Unfortunately, Johnson's employment with A New Path terminated when his former employer learned of the instant charges. Johnson found new employment at a bottling facility but recently suffered from a lay-off; he has collected unemployment and hopes to be reinstated like another member of his union was.

Johnson's criminal history is atypical of a defendant before this Court. Johnson's sole prior conviction results from a guilty plea of a misdemeanor for possession of less than 100 grams of marijuana. Ohio's recent marijuana legalization counsels against even considering this offense when sentencing Johnson. The PSIR's notation that Johnson has "struggled with marijuana use throughout his life and submitted urinalyses which tested positive for marijuana while on pretrial supervision," (PSIR, PageID # 824), lacks context. Johnson tested positive for marijuana with Pretrial Services on March 26, 2024 and April 16, 2024. The April positive result was due to residual marijuana in Johnson's body rather than abuse since the March test. (PSIR, ¶ 29). Johnson's marijuana use has declined so sharply since beginning interaction with Pretrial Services that his pretrial officer recommended that Johnson be removed from his oversight and that his marijuana testing cease.

> **C.** **The Court Should Not Deviate from the PSIR or the Plea Agreement With Respect to Financial Sentencing.**

The Court can impose fines. However, Johnson is indigent and has no ability to pay. Accordingly, Probation recommended no fines in the PSIR. The Plea Agreement does not indicate that the Court should impose a fine. Therefore, the Court should waive fines.

6

The Government and Johnson agreed to a full scope of restitution: $20,385.00 to the Small Business Administration ("SBA"); and $12,786.08 jointly and severally with Zephaniah Jones. The Court should impose restitution accordingly, with time to pay restitution in consideration of any term of incarceration.

**D.**     **The Court Should Sentence Johnson to No More Than 24 Months of Incarceration.**

The Court must impose a sentence that is sufficient but not greater than necessary to achieve its sentencing goals. The Probation Officer calculated Johnson's USSG offense level as 21 and properly coded Johnson as a Category I offender. Thus, Johnson's Guidelines range of incarceration is 37-46 months. Johnson and the Government entered into the Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The Plea Agreement includes a maximum term of incarceration of 43 months and provides the Court with authority to deviate downward from that figure based on its authority in sentencing.

Johnson poses absolutely no risk to the public. He has no significant criminal history, and none relating to firearms or a fraud-based offense at all. *See United States v. Stern*, 590 F. Supp. 2d 945, 951-963 (N.D. Ohio 2008) (imposing below-Guidelines sentence based in part on low risk of recidivism pursuant to § 3553(a) despite finding a downward departure inappropriate under the Guidelines). His sentence should reflect his very low risk of recidivism. *See United States v. Marshall*, 870 F. Supp. 2d 489, 495 (N.D. Ohio 2012) ("An individual with a low risk of recidivism does not need a lengthy incarceration for the protection of the public.").

The Court should fashion a period of incarceration while considering the collateral and profound effects that Johnson's incarceration will have on his family, especially his teenage sons and Stovall's son. Johnson's teenage sons are at a period in their life where their father's presence is critical. Johnson's sons require a strong role model, and Johnson is capable of providing that to

7

them. Johnson's single serious offense does not change that he has helped raise his sons for more than a decade, and that he is committed to continue raising them after he serves his term of incarceration. Moreover, Stovall's seven-year-old son is significantly attached to Johnson and treats him as his own father. Johnson understands and accepts he will be incarcerated for a period of years, but that period should not continue into his sons' graduation from high school and Stovall's son for longer than necessary. Therefore, the Court should consider a downward deviation from the 43 months in the Plea Agreement to a 24-month sentence of incarceration. This would punish Johnson adequately for what he has done, but also not improperly punish those close to Johnson. Specifically, Johnson's teenage sons would be approximately 15 years old when he is released.

Johnson has made significant strides while this matter pended. He has acquired employment at a higher pay rate than previously. He has ceased using marijuana to the point where his Pretrial Services Officer has recommended that he be removed from Pretrial Services completely. And all the while, Johnson has maintained significant and constant contact with his family. Johnson understands and recognizes the seriousness of the offenses with which he has been charged and is prepared to serve a period of incarceration as the final part of his atonement. But a period of incarceration exceeding 24 months is significantly greater than necessary to achieve the Court's sentencing goals. Indeed, Johnson already met many of the Court's sentencing goals.

Therefore, a period of 24 months of incarceration without fines is sufficient, but not greater than necessary in this matter.

## IV.      CONCLUSION

Accordingly, Johnson respectfully requests that the Court:

1. Deviates downwards from the maximum 43-month sentence pursuant to the Plea Agreement and sentences Johnson to 24 months of incarceration;

2. Waives fines;

3. Orders a $200 special assessment; and

4. Orders restitution in the amount of:

   a. $20,385.00 to the Small Business Administration ("SBA"); and

   b. $12,786.08 jointly and severally with Zephaniah Jones.

Dated: December 10, 2025

Respectfully submitted,

*/s/ William R. Gallagher*
William R. Gallagher
ARENSTEIN & GALLAGHER
114 East Eighth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-5666
Facsimile: (513) 651-5688
Bill@ArensteinGallagher.com

Benjamin G. Sandlin
THOMPSON HINE LLP
312 Walnut Street, Suite 2000
Cincinnati, OH 45202
Telephone: (513) 352-6700
Facsimile: (513) 352-4771
Ben.Sandlin@ThompsonHine.com

*Counsel for Defendant Jerin Johnson, Sr.*

9

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record by the

Court's electronic filing system.

Julie D. Garcia
Danielle E Margeaux
United States Department of Justice
221 E. Fourth Street, Suite 400
Cincinnati, OH 45202
julie.garcia@usdoj.gov
danielle.margeaux@usdoj.gov

*/s/ William R. Gallagher*
William R. Gallagher

10

EXHIBIT

tabbies'

A

To Whom It May Concern:

My uncle is my best friend, and our relationship is one of the most cherished aspects of my life. From my earliest memories, he has always been there, not just as a family member, but as a confidant and a source of unwavering support. I truly admire him for his wisdom, sense of humor, and the kindness he shows to everyone around him.

Growing up, he became my go-to-person for advice and encouragement. Whether it was navigating the complexities of school or dealing with the emotional rollercoaster of adolescence, I knew I could count on him.

My uncle is great! He is truly one of the most fascinating individuals I have ever known. Not only is he incredibly knowledgeable about a wide range of subjects, but he also has a remarkable ability to share that knowledge in an engaging and entertaining way. His passion for learning is infectious, and every time we spend time together, I find myself eager to soak up everything he has to offer.

Sincerely,


Steve Martin
513-628-6838

To Whom It May Concern:

Since I can remember my uncle has been my favorite!  We have done so many things together, and he has been a great aspect of my life.  We have had great conversations, have been to plenty of places together, and I know I can talk to him.  He does not judge, and he is someone I can count on.  Now I never played sports or anything, but he has been there for school events and graduations.  He is definitely inspirational and one you can look up to.

My uncle has been to so many places in the word I couldn't imagine going, and he always tells me the way to get there and do just that.  I just have not made the move to lol.  He also gives good advice!  May not be what I want to hear but he definitely is a great person to talk to and confine in.  And he is always happy, I mean literally, there is barely a time when he is not smiling from ear to ear lol.

Sincerely,


Keiarra Jones
513-501-3674

To Whom It May Concern:

I've known Jerin for 22 years.  In our younger life, he was always known for being mature, hardworking and respectful to others.  When he wasn't active in sports he kept a job.  After graduation, he was a big advocate for entrepreneurship.  Since he's had children, I have had the pleasure of witnessing him be an outstanding father.  He makes sure the kids stay active in not only sports but community activities and church.  Jerin makes sure the boys show leadership skills and integrity in everything that they do.  I have enjoyed watching him go from a young man to a genuine devoted father.

Sincerely,


Desire Morris
513-295-0724



EXHIBIT

B

To Whom It May Concern:

   Jerin is an amazing person, literally. He always is ready to be the first one to help anyone if he can. He puts himself last to care for others. As long as everyone else is taken care of, then he is totally fine with that. I have seen Jerin give his family and friends his last plenty of times. Jerin has taken my son in as his own and treats him like a son. He provides for him naturally and is a huge factor in his life. Without Jerin being in my son's life I know it would have a big impact on him in many ways. My son is very much attached to Jerin because he chose to be a consistent father figure in his life since he was 4 and he is now 7, especially since my son's dad passed away when he was 5. He involves my son with whatever he's doing with his own kids, going to the movies, park, baseball games, neighborhood carnivals, trips, he does everything with him to make him feel just as his own. He provides love, structure, and discipline into him on a daily basis and my son recognizes that.

   Jerin is very family oriented and is the main person who brings his family together. He's also the first person his family or friends call when they need help, advice or just to vent. Jerin is that person for everyone. He is goal oriented and has plans for him and his family that he knows he can achieve. He is disciplined and focused with everything important in his life. His kids are his absolute world and has been an extremely consistent father in their lives. Without a question he takes care of his kids in every way that he can. He supports them in whatever activities they're doing, such as sports, plays and church events. I couldn't imagine his boys not having Jerin as their father, they were really created for each other and its shows in every interaction. His boys are proud of their dad and love him unconditionally, without him being here it would have an enormous effect on his boys' lives. He is so loved by many people because of the positive energy he always has. He chooses to be on the bright side of any situation just so negative thoughts don't affect him or others. Jerin's family and friends do need him in many ways but him just being around gives them happiness.

Sincerely,


Angelique Stovall
513-370-9046